**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**GOOD 'NUFF GARAGE, LLC,
D/B/A GNG MOTORSPORTS,**

      **Plaintiff,**

    **v.**                      **Civil Action No. 3:21cv571**

**COLIN MCCULLEY,
CAITLYN VEHRS, and
CHESTER DOG ENTERPRISES LLC,**

      **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendants' Motion to Dismiss (the "Motion")

pursuant to Federal Rules of Civil Procedure 12(b)(1)[1] and 12(b)(6).[2]  (ECF No. 17.)  Plaintiff

Good 'Nuff Garage, LLC ("Good 'Nuff Garage") responded to the Motion, (ECF No. 20), and the

Defendants replied, (ECF No. 23).  Accordingly, this matter is ripe for adjudication.  The Court

dispenses with oral argument because the materials before it adequately present the facts and

legal contentions, and argument would not aid the decisional process.  The Court exercises

---

[1] Rule 12(b)(1) allows dismissal for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).

[2] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

jurisdiction pursuant to 28 U.S.C. §§ 1331,[3] 1367(a).[4]  For the reasons stated below, the Court will deny Defendants' Motion to Dismiss.

### I. Factual and Procedural Background

This matter stems from actions taken by Defendants Chester Dog Enterprises LLC ("Chester Dog"), Caitlyn Vehrs, and Colin McCulley regarding alleged infringement of the "GNG" and "GNG Motorsports" marks and Defendants' refusal to return the administrative access to the GNG business Facebook profile.  In its Complaint, Good 'Nuff Garage seeks both damages as well as preliminary and permanent injunctive relief under the Lanham Act, 15 U.S.C. § 1125(a), and the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030.[5]  (ECF No. 1 ¶¶ 106, 121.)

---

[3] Section 1331 of Title 28 of the United States Code provides:

The district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331.

[4] Section 1367(a) of Title 28 of the United States Code provides:

Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

[5] Plaintiff's Motion for Preliminary Injunctive Relief, (ECF No. 4), has since been withdrawn, without prejudice.  (ECF No. 21.)  Plaintiff made this decision in light of its determination that "further discovery is needed at this stage" to resolve the disputes of fact between the parties.  (ECF No. 21, at 1.)

A.    **Factual Allegations**[6]

   1.    **Inception of Good 'Nuff Garage**

On January 20, 2017, Good 'Nuff Garage, LLC assumed the name of "GNG Motorsports"—an abbreviation of "Good 'Nuff Garage" followed by the generic term "Motorsports." (ECF No. 1 ¶¶ 22, 28.) After assuming this name, GNG Motorsports established itself as a "go-to service provider" for the Subaru motorsport community within the greater Richmond area and the entire Commonwealth of Virginia. (ECF No. 1 ¶ 20.) Since that time, Good 'Nuff Garage has used the marks "GNG" and "GNG Motorsports" continuously within commerce, both in association with products and services offered as well as in communications directed toward the customers and vendors with whom Good 'Nuff Garage maintains active relationships. (ECF No. 1 ¶¶ 25–26.)

   In addition to appearing on Good 'Nuff Garage's place of business, the "GNG" and "GNG Motorsports" marks appeared within both traditional physical merchandising media and sponsored promotions that were disseminated using the Facebook profile affiliated with Good 'Nuff Garage. (ECF No. 1 ¶¶ 30–35.) Good 'Nuff Garage maintains that both "GNG" and "GNG Motorsports" are either "arbitrary or otherwise inherently distinctive mark[s] in commerce." (ECF No. 1 ¶ 29.) Indeed, Plaintiff asserts that through the "continuous and exclusive use . . . in commerce for numerous years" the "GNG" and "GNG Motorsports" marks "have become well and favorably known throughout Virginia." (ECF No. 1 ¶ 38.) Good 'Nuff Garage states that the highly specialized nature of the products and services they offer places

---

   [6] In ruling upon a Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

special emphasis on existing relationships with repeat customers, which exacerbates any threat to the goodwill associated with the "GNG" and "GNG Motorsports" marks.  (ECF No. 1 ¶ 27.)

### 2.    Termination of Employment Relationship(s)

Good 'Nuff Garage employed Defendant Colin McCulley as the shop manager, though McCulley was not a partial owner or member of the business.  (ECF No. 1 ¶ 39).  However, on or around June 14, 2021, McCulley approached the owner of Good Nuff Garage, Joshua Barnhill, and indicated a desire to purchase Good 'Nuff Garage.  (ECF No. 1 ¶ 49.)  After Barnhill revealed the purchasing price for Good 'Nuff Garage, "McCulley became upset."  (ECF No. 1 ¶ 50.)

On July 12, 2021, McCulley resigned from the position as shop manager.  (ECF No. 1 ¶ 51.)  Following McCulley's resignation, two Good 'Nuff Garage employees, Defendants Adam Meade and Caitlyn Vehrs, also resigned from their respective positions.  (ECF No. 1 ¶ 52.)  "McCulley solicited [both] employees to resign their employment with [Good 'Nuff Garage] to start a competing business."  (ECF No. 1 ¶ 54.)  Because Meade and McCulley were "the only auto technicians able to service vehicles," their respective resignations forced Good 'Nuff Garage's "to delay servicing customers."  (ECF No. 1 ¶ 58.)  Due to this delay, Plaintiff "lost substantial business."  (ECF No. 1 ¶ 58.)  As of the filing of the Complaint, Good 'Nuff Garage "has lost $97,000 in revenue and $14,500 in lost profit" and has been required to "return at least $22,411.05 to customers."  (ECF No. 1 ¶¶ 59–60.)

"[P]rior to . . . giving [his] notice of resignation," McCulley approached numerous customers to convince them to remove their vehicles from Good 'Nuff Garage's premises and bring them to his competing business.  (ECF No. 1 ¶ 57.)  Within twenty-four hours of the employees' resignations, "numerous customers of [Good 'Nuff Garage] removed their vehicles

from" the shop. (ECF No. 1 ¶ 55.) Some "of those customers specifically removed their vehicles [from Good 'Nuff Garage's shop] to take their vehicles to Defendant McCulley for service." (ECF No. 1 ¶ 56.)

Following McCulley, Meade, and Vehrs's resignations, Good 'Nuff Garage found itself unable to service its existing customers. (ECF No. 1 ¶ 78.) As a result, Good 'Nuff Garage elected "to sell its existing inventory and parts at an undervalued price" and terminate its lease of its garage space. (ECF No. 1 ¶ 78.) Since the termination of that lease, Cambo Auto Center, LLC—an auto service provider now leasing the garage space—"has . . . permitted Defendants (either individually or through [Defendant Chester Dog Enterprises ('Chester Dog')]), to lease" or else "otherwise use Plaintiff's prior garage to start a repair and service shop." (ECF No. 1 ¶ 79.)

### 3.    **Creation of GNG Performance**

Chester Dog has created a repair and service shop at Good 'Nuff Garage's former premises operating under the name "GNG Performance" that uses a mark resembling the marks that Good 'Nuff Garage had previously publicized at that location. (ECF No. 1 ¶¶ 80–81.) Indeed, the similarity between the GNG Motorsports and GNG Performance marks has led to several instances of actual confusion between the parties among both consumers and vendors. (ECF No. 1 ¶¶ 72–73, 93.) For example, Good 'Nuff Garage avers that several Facebook posts made during August of 2021 indicated to the viewer that GNG Performance was a continuation of GNG Motorsports. (ECF No. 1 ¶¶ 82–83.) Good 'Nuff Garage further submits that Defendants, either individually or through the collective organization of Chester Dog, acted to impair Good 'Nuff Garage's existing contracts or to substitute GNG Performance for Good 'Nuff Garage within existing contractual relationships. (ECF No. 1 ¶¶ 86–92.)

### 4.   The Facebook Business Page

Prior to both his employment with Good 'Nuff Garage and the official creation of Good 'Nuff Garage as a business enterprise, McCulley generated a GNG Motorsports page under the initial name "Good Nuff' Garage [sic]" using his personal Facebook account.  (ECF No. 1 ¶ 45.) Following the organization of Good 'Nuff Garage as a business entity, McCulley "assisted Plaintiff in transferring the 'Good Nuff' Garage [sic]' page to Plaintiff's business Facebook page, which included changing the 'Good Nuff' Garage [sic] Facebook page to Plaintiff's business page under the name 'GNG Motorsports,'" (ECF No. 1 ¶ 46).  After this transfer, the Facebook page was used for Good 'Nuff Garage's business purposes, including that Good 'Nuff Garage had at several points paid for promotions on the Facebook platform using that page. (ECF No. 1 ¶ 48.)

McCulley continued to use the GNG Motorsports Facebook page after his employment with Plaintiff terminated and refused to return the administrative access to the page.  (ECF No. 1 ¶¶ 61–62.)   On July 12, 2021, McCulley made post on the page, stating that the message was "a personal post by Colin [McCulley]" despite the page's designation as a business page.  (ECF No. 1 ¶ 61.)  McCulley also used his administrative privileges to change the contact email associated with the page to one which Good 'Nuff Garage could not access, effectively preventing them from reassuming control of the page.  (ECF No. 1 ¶ 63.)  Good 'Nuff Garage made several attempts to contact McCulley regarding the return of the administrator privileges, but McCulley failed to return the access to the page.  (ECF No. 1 ¶¶ 64, 67.)

On July 17, 2021, Good 'Nuff Garage's outside counsel sent McCulley a cease and desist letter requesting the return of the administrator credentials to Good 'Nuff Garage.  (ECF No. 1

¶ 67.)  However, on or before July 26, 2021, in response to the cease and desist letter, McCulley deleted the GNG Motorsports Facebook page.  (ECF No. 1 ¶ 68.)

### B.   Procedural Background

On September 2, 2021, Good 'Nuff Garage filed its eight-count Complaint.  (ECF No. 1) In Count I, Good 'Nuff Garage alleges that Defendants engaged in False Designation of Origin and/or Trademark Infringement under the Lanham Act, (15 U.S.C. § 1125(a)).  (ECF No. 1 ¶ 106.)  In Count II, Good 'Nuff Garage submits that McCulley and Chester Dog violated the Computer Fraud and Abuse Act, (18 U.S.C. § 1030).  (ECF No. 1 ¶ 121.)  In Counts III and IV, Good 'Nuff Garage claims that McCulley and Vehrs breached their duty of loyalty and fiduciary duty of loyalty under Virginia law.  (ECF No. 1 ¶¶ 132, 141.)  Finally, in Counts V through VIII, Good 'Nuff Garages alleges tortious interference with existing or expected contractual relations and prospective business, unfair competition in violation of Virginia law, and violations of the Virginia Trademark and Services Act against all three Defendants.  (ECF No. 1 ¶¶ 147, 155, 163, 173.)

On October 8, 2021, Defendants Colin McCulley, Caitlyn Vehrs, and Chester Dog filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (ECF No. 17.)  In support of their Motion to Dismiss, Defendants argue that Count I and Count II of the Complaint fail to state a claim upon which relief can be granted and that the remaining Counts "fail[] to allege sufficient facts to establish subject matter jurisdiction."  (ECF No. 18, at 1.)  In response to the alleged facts set forth in Defendants' Motion to Dismiss, Good 'Nuff Garage withdrew its Motion for Preliminary Injunction, (ECF No. 4), without prejudice, on the consideration that additional discovery was required to resolve the factual disputes between

opposing parties, (ECF No. 21).  The matter is fully briefed, and for the reasons articulated in

the sections below, the Court will deny Defendants' Motion to Dismiss.

## II.  Standards of Review

### A.    Federal Rule of Civil Procedure 12(b)(1)

Federal district courts are courts of limited subject matter jurisdiction. *United States ex*

*rel. Vuyvuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Exxon Mobile Corp. v.*

*Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005)).  This Court must, as a result, determine

whether it has jurisdiction over the claims at issue.  *See Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold

matter 'spring[s] from the nature and limits of the judicial power of the United States' and is

'inflexible and without exception'") (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379,

382 (1884)).  "The objection that a federal court lacks subject-matter jurisdiction . . . may be

raised by a party, or by a court on its own initiative, at any stage in the litigation . . . ." *Arbaugh*

*v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenging the

Court's subject matter jurisdiction, the burden rests with the plaintiff, as the party asserting

jurisdiction, to prove that federal jurisdiction is proper.  *See Int'l Longshoremen's Ass'n, S.S.*

*Clerks Loc. 1624, AFL-CIO v. Virginia Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va.

1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v.*

*Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  A motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(1) can attack subject matter jurisdiction in two ways. *See Kerns v. United States*, 585 F.3d

187, 192 (4th Cir. 2009).  First, a Rule 12(b)(1) motion may attack the complaint on its face,

asserting that the complaint fails to state a claim upon which subject matter jurisdiction can lie.

8

*See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. In such a challenge, a court assumes the truth of the facts alleged by plaintiff. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219.

Alternatively, a Rule 12(b)(1) motion may also challenge the existence of subject matter jurisdiction in fact, apart from the pleadings. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams*, 697 F.2d at 1219); *see also Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338. In such a case, because a party challenges the court's "very power to hear the case," the trial court is free to weigh evidence to determine the existence of jurisdiction. *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338; *see also Adams*, 697 F.2d at 1219. Because Defendants challenge whether Good 'Nuff Garage's Complaint states claims upon which subject matter jurisdiction can lie, the Court assumes the truth of the facts alleged by Good 'Nuff Garage.

**B.      Federal Rule of Civil Procedure 12(b)(6)**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

9

550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for

relief must contain . . . a short and plain statement of the claim showing that the pleader is

entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief

are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate

some factual enhancement within the complaint to cross the line between possibility and

plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)

(quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a

reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S.

at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). This analysis is context-specific

and requires "the reviewing court to draw on its judicial experience and common sense."

*Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual

allegations to be true and determine whether, viewed in the light most favorable to the plaintiff,

they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*,

684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must

accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable

inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)). This principle

applies only to factual allegations; however, and "a court considering a motion to dismiss can

choose to begin by identifying pleadings that, because they are no more than conclusions, are not

entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III.  Analysis

The gravamen of Defendants' Motion to Dismiss is that Plaintiff fails to state a claim

under the Lanham Act in Count I and the Computer Fraud and Abuse Act in Count II, meaning

10

that Plaintiff also fails to establish federal subject matter jurisdiction. Defendants propose that

these deficiencies in the first two counts of the Plaintiff's Complaint are fatal to the remainder of

the state law claims alleged in Counts III through VIII, because that would eliminate any

grounding for supplemental jurisdiction. Accordingly, in resolving the Defendants' Motion to

Dismiss, the Court focuses upon the sufficiency Counts I and II of the Complaint.

### A.   Good 'Nuff Garage States a Claim for Relief in Count I's Claim of False Designation of Origin and/or Trademark Infringement Under the Lanham Act

In Count I, Good 'Nuff Garage alleges that Defendants' use of the "GNG" and "GNG

Performance" marks infringed upon its federal trademark rights in the "GNG" and "GNG

Motorsports" marks under the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff sufficiently pleads

that the "GNG" and "GNG Motorsports" marks were used in commerce and are distinctive,

indicating that the marks qualify for protection pursuant to the Lanham Act. Moreover, Plaintiff

states facts enabling the Court to find that, based on the allegations in the Complaint, Plaintiff's

marks were valid and that Defendants' use of similar marks is likely to cause confusion among

consumers. Thus, especially read favorably, Good 'Nuff Garage has stated a claim for false

designation of origin and/or trademark infringement under the Lanham Act. The Court will deny

the Motion Dismiss as to Count I.

### 1.   Legal Standard:  Requirements Unregistered Marks Must Satisfy to Receive Protection Under the Lanham Act

A plaintiff may succeed on a claim of false designation of origin or trademark

infringement under the Lanham Act "even [if] the mark or name has not been federally

registered." *RMV Enterprises, LLC v. KSoftware.com*, Case No. 1:12cv335, 2012 WL 4739524,

at *2 (E.D. Va. Aug. 24, 2012) (quoting *Int'l Bancorp, LLC, et al. v. Societe des Baines de Mer

et du Cercle des Etrangers a Monaco*, 192 F. Supp. 2d 467, 479 (E.D. Va. 2002)). "In order for

an unregistered mark to receive trademark protection, . . . ([1]) it 'must  be used in commerce[;]' and ([2]) . . . 'be distinctive.'" *Institute for Justice v. Media Grp. of Am., LLC*, Case No. 1:15cv1410, 2015 WL 7758845, at *3 (E.D. Va. Nov. 30, 2015) (quoting *Int'l Bancorp, LLC, et al. v. Societe des Baines de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 363 (4th Cir. 2003)).

As for the use in commerce requirement, "[a] mark is used in commerce only if it accompanies services rendered in commerce, i.e., it is employed appurtenant to an established business or trade that is in commerce." *Id.* (quoting *Int'l Bancorp, LLC*, 329 F.3d at 364).

"In determining how distinctive a mark is, the Fourth Circuit" classifies word marks "into four different categories:  (1) generic, (2) descriptive,[7] (3) suggestive,[8] and (4) arbitrary or fanciful." *Id.* at *4 (citation omitted) (internal quotation marks omitted). "Under this hierarchy of distinction, generic marks receive no protection, descriptive marks require proof of secondary meaning to be eligible for protection, while suggestive and fanciful marks are inherently distinctive." *Id.* (quoting *Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 748 (E.D. Va. 2012). In addition, an abbreviation falls within the same category as the term underlying that abbreviation. *See id.* at *4; *see also* 1 McCarthy on Trademarks and Unfair Competition § 7:18 (5th ed.) ("Americans are prone to abbreviate recognized trademarks and to

---

[7] "'[D]escriptive' marks . . . describe a function, use, characteristic, size or intended purpose of the product, such as: 5 Minute glue, King Size men's clothing[,] and the Yellow Pages directory." *Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 759 (E.D. Va. 2012), *aff'd* 739 F.3d 150 (4th Cir. 2014) (quoting *Venetian Casino Resort, LLC v. VenetianGold.com*, 380 F. Supp. 2d 737, 742 (E.D. Va. 2005)).

[8] Suggestive marks are those that "stand[] for an idea which requires some operation of the imagination to connect it with the goods" or services offered. *Swatch, S.A.*, 888 F. Supp. 2d at 759 (citation omitted) (internal quotation marks omitted).

use nicknames.  Such abbreviations and nicknames are just as entitled to legal protection as the original full trademark.").

      2.    **The Lanham Act Protects the "GNG" and "GNG Motorsports" Marks Because Plaintiff Used the Marks in Commerce, and the Marks Are Distinctive**

Although Plaintiff does not claim that the marks were registered, Plaintiff has alleged facts sufficient to show that it used the "GNG" and "GNG Motorsports" in commerce and that the marks are distinctive, thus entitling the marks to protection under the Lanham Act.

First, Good 'Nuff Garage has made several allegations in its Complaint illustrating use of the "GNG" and "GNG Motorsports" marks to "identify itself and its services." *Institute for Justice*, 2015 WL 7758845, at *3.  For example, Plaintiff states that it uses the "marks in commerce in association with its promotions, products and services," as well as "to communicate with customers, vendors, and all others doing business with Plaintiff, including without limitation, utilizing the mark on email communication, written documents, and other forms of communication."  (ECF No. 1 ¶¶ 25–26.)  Plaintiff also declares that it utilizes graphics depicting the marks and that it displays the marks on its merchandise and in its marketing materials.  (*See* ECF No. 1 ¶¶ 30–31, 36–37; ECF No. 1-4.)  Based on these allegations and the attached exhibits, Plaintiff has sufficiently pleaded that it has used the marks in commerce.  *See Institute for Justice*, 2015 WL 7758845, at *3 (finding that the plaintiff had used a mark in commerce when it provided the Court with "a host of examples of when it has used [the mark] . . . to identify itself and its services, including emails, letters, holiday cards, calendars, promotional materials, and advertisements").

Second, the "GNG" and "GNG Motorsports" marks are distinctive.  To begin, "[t]he underlying term in this case, "[Good 'Nuff Garage]," is best categorized as a suggestive mark:  it

does not directly describe the services Plaintiff supplies, but it does suggest them," even if some ambiguity remains. *Id.* at *4; *see also id.* (stating that "Institute for Justice," the name of a non-for-profit, non-partisan public interest law and policy firm, "is best categorized as a suggestive mark" for a nearly identical reason). "The [term 'Good 'Nuff Garage'] is also neither fanciful nor arbitrary because it is neither a made-up word[9] nor is it completely unrelated to . . . Plaintiff's services." *Id.* Accordingly, "[t]he abbreviation ['GNG,' as used alone and as part of 'GNG Motorports,'[10]] can correspondingly be categorized as a suggestive mark." *Id.* Thus, because suggestive marks are considered "inherently distinctive," the marks "GNG" and "GNG Motorports" are distinctive. *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 157 (4th Cir. 2014).

### 3.   Legal Standard:  False Designation and/or Trademark Infringement Claims Under the Lanham Act

To support a claim of false designation of origin and/or trademark infringement under the Lanham Act, "a plaintiff must demonstrate[: (1)] that it has a valid, protectable trademark[;] and[, (2)] that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *United Supreme Council, 33 Degree of Ancient & Accepted Scottish Rite of Freemasonry, Prince Hall Affiliation, S. Jurisdiction of the U.S. v. United Supreme Council, 33 Degree of Ancient & Accepted Scottish Rite of Freemasonry, Prince Hall*

---

[9] "'Nuff" is a widely recognized colloquialism for enough. *See, e.g.*, 'nuff, https://www.dictionary.com/browse/nuff (last visited Aug. 30, 2022). Thus, despite its informality, the Court does not consider "'Nuff" to be a made-up word.

[10] The addition of "Motorsports" in the "GNG Motorsports" mark still merely suggests the services Plaintiff provides. *See Institute for Justice*, 2015 WL 7758845, *4. It does not directly describe them. *See id.*

*Affiliated*, 329 F. Supp. 3d 283, 293 (E.D. Va. 2018) (citing *Lone Star Steakhouse & Saloon, Inc.*

*v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)).

      To satisfy the first prong (that the plaintiff has a "valid, protectable trademark"), a

plaintiff must show:  (1) "that [the] . . . mark [is] inherently distinctive;" or, alternatively, (2)

"that even if the . . . mark is not inherently distinctive, [it] has become distinctive by acquiring

secondary meaning." *East West, LLC v. Rahman*, 896 F. Supp. 2d 488, 499 (E.D. Va. 2012)

(citation omitted).  The degree to which a plaintiff has a valid, protectable mark is "directly

related to the mark's distinctiveness." *Id.* (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81

F.3d 455, 464 (4th Cir. 1996)).

      To satisfy the second prong, about whether the senior mark is distinctive, a plaintiff must

show that "' the defendant[s'] actual practice is likely to produce confusion in the minds of

consumers about the origin of the goods or services in question.'" *Swatch AG*, 739 F.3d at 158

(*CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)).  The Fourth

Circuit has delineated a set of nine factors to evaluate the likelihood of confusion:

> (1) the strength or distinctiveness of the mark claiming protection;
> (2) the similarity of the marks to consumers;
> (3) the similarity of the goods or services that the marks identify;
> (4) the similarity of the facilities used by the markholders;
> (5) the similarity of advertising used by the markholders;
> (6) the defendant's intent;
> (7) actual confusion;
> (8) the quality of the defendant's [goods or services]; and[,]
> (9) the sophistication of the consuming public.

*Id.* (citing *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009)).

"These nine factors serve as a guide rather than 'a rigid formula for infringement;' they are not

all of equal importance and not all factors are relevant in every case." *Id.* at 158–59 (quoting

*George & Co.,* 575 F.3d at 393).

> **4.** **Based on the Complaint's Allegations, the "GNG" and "GNG Motorsports" Marks Are Valid Marks, and Defendants' Use of the "GNG" and "GNG Performance" Marks Is Likely to Cause Confusion Among Consumers**

Read favorably, the allegations in Plaintiff's Complaint satisfy the pleading requirements for a claim of false designation and/or trademark infringement under the Lanham Act. Specifically, the allegations indicate that the "GNG" and "GNG Motorsports" marks are valid, thus satisfying the first prong of the inquiry, and further, that Defendants' use of its "GNG" and "GNG Performance" marks is likely to cause confusion among consumers, satisfying the second prong.

First, as previously discussed, because "GNG" and "GNG Motorsports" are suggestive marks, they are inherently distinctive. *See* Part III.A.2; *Swatch AG*, 739 F.3d at 157. Therefore, Plaintiff has satisfied the first prong of the two-prong test. *See East West*, 896 F. Supp. at 499 (citation omitted).

The viability of Plaintiff's Lanham Act claim depends upon whether the allegations in the Complaint satisfy the second prong of the inquiry. That is: Is "[D]efendant[s'] use of a colorable imitation of the trademark . . . likely to cause confusion among consumers"? *United Supreme Council*, 329 F. Supp. 3d at 293 (citing *Lone Star Steakhouse & Saloon, Inc*, 43 F.3d at 930). Examination of the nine factors delineated by the Fourth Circuit indicates that the answer is overwhelmingly "yes." Indeed, seven of the nine factors—including the paramount factor of strength or distinctiveness—weigh in favor of this Court finding a likelihood of confusion.

> **i.** **The Strength and Distinctiveness of the Marks Weigh in Favor of a Finding that Defendants' Marks Are Likely to Cause Confusion Among Consumers**

This first factor is "'paramount' in determining the likelihood of confusion." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314–15 (4th Cir. 2017) (quoting *Pizzeria Uno Corp. v.*

*Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)). Because the Court has already determined that the "GNG" and "GNG Motorsports" marks are distinctive, *see* Part III.A.2, this factor weighs in favor of a finding that Defendants' use of the "GNG Performance" mark is "likely to cause confusion among consumers," *United Supreme Council*, 329 F. Supp. 3d at 293 (citing *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 930).

### ii. The Similarity of the Marks to Consumers Supports a Finding That Defendants' Marks Are Likely to Cause Confusion Among Consumers

The second factor of the confusion test focuses on whether there is "a similarity in sight, sound, and meaning" which might cause confusion regarding the marks. *George & Co. LLC*, 575 F.3d at 396. When a mark constitutes multiple words or terms, the determination of similarity focuses on the dominant aspect or the mark with the "identity of the dominant term in both marks" being "a strong indicator of that similarity in appearance . . . which would result in confusion." *Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.*, 87 F. Supp. 2d 567, 581 (E.D. Va. 2000) (citing *Pizzeria Uno Corp.*, 747 F.2d at 1534).

A high degree of similarity exists between Plaintiff's marks ("GNG" and "GNG Motorsports") and Defendants' "GNG Performance" mark. The dominant term within all three marks is the distinctive mark, "GNG." Additionally, between the "GNG Motorsports" and "GNG Performance" marks, the only difference pertains to the descriptive term in each mark relating to the goods and services offered by the respective businesses. These elements coalesce to indicate a high degree of similarity in how the two sets of marks appear to consumers, placing the second factor of the confusion analysis strongly in favor of Plaintiff.

### iii. The Similarity of the Goods and Services Offered by Plaintiff and Defendants Supports a Finding That Defendants' Marks Are Likely to Cause Confusion Among Consumers

The third factor compares the goods and services offered by the entities claiming the marks. When marks are used in competition, the goods and services need not be identical if they are sufficiently "related" to lead a reasonable consumer "to believe, mistakenly, that the infringer's goods come from the same source as the senior user's goods or are sponsored or approved by the senior user." *IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 826 (E.D. Va. 1998).

The evaluation of this third factor weighs heavily in favor of a likelihood of confusion between the two sets of marks. Good 'Nuff Garage, through its marks "GNG" and "GNG Motorsports," is a "service provider" for "repair[s], parts, and products for Subaru motorsport vehicles within Richmond, Virginia, the surrounding area, and throughout the Commonwealth of Virginia." (ECF No. 1 ¶ 20.) Defendants, through the "GNG Performance" mark, operate an auto "repair and service shop" and offer "quality service to the Subaru community local and beyond." (ECF No. 1 ¶¶ 79, 82.) Given the functionally identical nature of the auto repair and customization services provided to Subaru owners by both Plaintiff and Defendants' respective businesses, the services are decidedly related. This relation indicates a high degree of similarity between the services offered by each set of mark holders, thereby satisfying the third factor of the confusion analysis.

### iv. The Similarity of the Facilities Used to Transact Business Weighs in Favor of a Finding That Defendants' Marks Are Likely to Cause Confusion Among Consumers

The fourth factor examines the similarity between the facilities that each mark holder uses to provide goods or services to consumers.

18

Here, the facilities of Plaintiff and Defendants share the highest degree of similarity they

can. They are identical. Prior to the events that precipitated this case, Good 'Nuff Garage

provided services to the consumer from "a motor vehicle shop located at 11201 Hopson Road,

Suites B & C, Ashland, Virginia, 23005." (ECF No. 1 ¶ 12.) Defendants have since occupied

the same facility and continued to "use Plaintiff's prior garage to start a repair and service shop."

(ECF No. 1 ¶ 79.) Because the facility used by each mark holder to provide goods and services

is in fact the same garage, an overwhelming presumption of similarity of place exists that might

contribute to an increased likelihood of confusion.

> ### v. The Similarity of Plaintiff's and Defendants' Advertising Weighs in Favor of a Finding That Defendants' Marks Are Likely to Cause Confusion Among Consumers

"In analyzing [the fifth] factor, courts consider: '[(1)] the media used, [(2)] the

geographic areas in which advertising occurs, [(3)] the appearance of the advertisements, and

[(4)] the content of the advertisements.'"[11] *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650,

667 (E.D. Va. 2017) (quoting *CareFirst*, 434 F.3d at 273).

The fifth factor of the confusion test plainly weighs in favor of a finding of likelihood of

confusion between the two marks. There is a clear visual similarity between the formatting

which appears on both Good 'Nuff Garage and Defendants' graphics. (*See* ECF No. 1 ¶¶ 30, 81.)

These graphics were each used within the same advertising media, namely business Facebook

pages targeted towards the Subaru performance-car community within the greater Richmond

area. (*See* ECF No. 1 ¶¶ 46, 48, 74.) The visual similarity of the branding attached to the

---

[11] "The Fourth Circuit also compares the *amount* of advertising between plaintiff and
defendant." *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 667 (E.D. Va. 2017) (citing
*CareFirst*, 434 F.3d at 273). Plaintiff does not allege facts pertaining to the amount of
advertising, so that subfactor does not weigh in favor of finding a likelihood of confusion.

advertisement combined with the overlap in both advertising media and intended audience indicate a high chance of confusion between the two marks. Accordingly, the similarity in advertising between the mark holders supports the conclusion that consideration of this factor indicates a likelihood of confusion. Indeed, Plaintiff alleges that Defendant McCulley maintained the administrative rights to Plaintiff's Facebook page and continued to use Plaintiff's Facebook page without authority. Defendant McCulley also continues to deny Plaintiff the administrative rights.

### vi.  Allegations Regarding Defendants' Intent Support a Finding That Defendants' Marks Are Likely to Cause Confusion Among Consumers

The sixth factor looks to evidence of the defendants' intent in their use of the challenged mark. "Generally, '[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as to deliberately induce confusion.'" *Seacret Spa Int'l v. Lee*, Case No. 1:15cv405, 2016 WL 880367, at *6 (E.D. Va. Mar. 8, 2016) (quoting *Pizzeria Uno Corp.*, 747 F.2d at 1535). Moreover, "a good faith belief that a subsequently-adopted mark will not lead to confusion . . . is no defense if a court finds actual or likelihood of confusion." *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 460 (E.D. Va. 2019) (quoting *Pizzeria Uno Corp.*, 747 F.2d at 1535). But mere knowledge of another's goods, is, by itself, insufficient to establish "an intent to mislead and to cause consumer confusion." *George & Co.*, 575 F.3d at 398 (citation omitted) (internal quotation marks omitted).

Good 'Nuff Garage has alleged that Defendants "falsely claimed that they are continuing the business of GNG Motorsports in an effort to steal Plaintiff's existing and prospective customers" by "capitalizing on Plaintiff's goodwill, recognition, and positive reputation."

(ECF 1 ¶¶ 80, 97.)  Plaintiff further declares that the "Defendants engaged in [this] conduct with an intent to confuse and deceive the public." (ECF No. 1 ¶ 98.)  To support this assertion, Good 'Nuff Garage points to several instances where the Defendants acted in a manner that "impl[ied] that they are/were owners of GNG Motorsports." (*E.g.*, ECF No. 1 ¶ 85 ("Defendants . . . posted on the GNG Performance Facebook page that they have a new phone number[ and] stating: 'If you currently have either [Defendant McCulley] or [Defendant Vehrs's] personal contact information and you want to reach them regarding service - PLEASE USE THIS NEW NUMBER INSTEAD.'").  Plaintiff has pleaded sufficient facts to support the reasonable inference that Defendants acted with an intent to exploit the goodwill associated with the "GNG" and "GNG Motorsports" marks.  Accordingly, the resolution of the sixth factor is strongly indicative of a likelihood of confusion between the two parties' marks.

### vii.  Instances of Actual Confusion Weigh in Favor of a Finding That Defendants' Marks Are Likely to Cause Confusion Among Consumers

The seventh factor considers documented instances of actual confusion among the consuming public, "an important factor that weighs heavily in the overall likelihood of confusion analysis." *Combe Inc.*, 382 F. Supp. 3d at 460 (citing *Sara Lee*, 81 F.3d at 467).  "The Fourth Circuit has explained that '[a]ctual confusion can be demonstrated by both anecdotal and survey evidence.'" *Id.* at 461 (quoting *George & Co.*, 575 F.3d at 398).

This factor heavily favors Plaintiff.  Plaintiff alleges at least three documented instances of actual confusion between Good 'Nuff Garage and the Defendants' business that occurred in the months following the organization of GNG Performance when vendors mistakenly charged Plaintiff for purchases made by, and services performed for, Defendants.  Specifically, vendor Hyman Bros Subaru mistakenly charged Plaintiff $552.56, vendor AutoZone mistakenly charged Plaintiff for $39.91, and vendor Ecotech Import Auto Repair mistakenly charged Plaintiff

21

$2,226.14. (*See* ECF No. 1 ¶¶ 71–73.) Plaintiff also alleges another instance of actual confusion that occurred on August 20, 2021, when a customer attempted to pay Plaintiff for work that had been completed by Defendants. (*See* ECF No. 1 ¶ 93.) The existence of these discrete examples of actual confusion between the underlying businesses creates "weigh[] heavily" in favor of finding a likelihood of confusion. *Combe Inc.*, 382 F. Supp. 3d at 460 (citing *Sara Lee*, 81 F.3d at 467).

Neither party addresses the final two factors—the quality of Plaintiff's and Defendants' goods and services, and the sophistication of the consuming public—in the Complaint or the briefing pertaining to Defendants' Motion to Dismiss. The Court briefly does so here to explain that, in this case, they do not weigh in favor of or against a finding of a likelihood of confusion.

### viii.   The Quality of Defendants' Product Has No Bearing on the Likelihood of Confusion in This Case

The eighth factor relates to whether there is a significant difference in quality exists between the products produced under the junior mark compared to those under the senior mark. *Cf. Valador, Inc.*, 241 F. Supp. 3d at 670 (quoting *George & Co.*, 575 F.3d at 399) ("[T]he quality of a defendant's product is typically germane only in 'situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods.'"). However, this factor has no bearing on the likelihood of confusion inquiry in this case because Plaintiff's Complaint does not include allegations regarding quality.

### ix.   The Sophistication of the Consuming Public Does Not Impact the Likelihood of Confusion Analysis in This Case

The ninth and final factor qualifies the early factors by examining the sophistication of the intended consumers of a product relative to the general public. "[B]arring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public

at-large." *Combe Inc.*, 382 F. Supp. 3d at 466 (quoting *Sara Lee*, 81 F.3d at 467). "In particular, this factor is only relevant to the likelihood of confusion analysis if the typical consumer in the relevant market 'possesses an expertise' regarding the product at issue or is 'more sophisticated about that product than those who comprise the market for other ordinary retail goods.'" *Id.* (quoting *Sara Lee*, 81 F.3d at 467).

Plaintiff's Complaint does not directly address the relative sophistication of its customers in a manner that is probative for the likelihood of confusion analysis. This is not an unusual case in which buyer sophistication comes into play. As such, at this procedural juncture, this factor does not impact the likelihood of confusion analysis.

### Conclusion

In sum, seven of the nine factors weigh in favor of a finding that Defendants' use of its "GNG Performance" mark is "likely to cause confusion among consumers." *United Supreme Council*, 329 F. Supp. 3d at 293 (citing *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 930). Thus, while likelihood of confusion is an inherently factual issue that cannot be resolved on a motion to dismiss, the allegations in the Complaint strongly favor of a determination that the Plaintiff has alleged sufficient facts to support its claim of false designation of origin or trademark infringement.

**B.      In Count II, Plaintiff States a Claim That Defendants McCulley and Chester Dog Have Violated the Computer Fraud and Abuse Act**

Good 'Nuff Garage has asserted claims under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C) (the "obtaining information claim"), 1030(a)(4) (the "loss from unauthorized access with intent to defraud claim"), and 1030(a)(5)(C) (the "intentional

unauthorized access with damage and loss claim").[12]  (ECF No. 1 ¶ 121.)  Plaintiff successfully

asserts facts sufficient to support these claims.  Accordingly, the Court will deny the Motion to

Dismiss as to Count II.  The Court considers each alleged violation in turn.

### 1.    Legal Standard: § 1030(a)(2)(C), the Obtaining Information Claim

To maintain a civil claim under § 1030(a)(2)(C) of the Computer Fraud and Abuse Act—

an obtaining information claim—a plaintiff must allege that the defendant "intentionally

access[ed] a computer without authorization or exceed[ed] authorized access, and thereby

obtain[ed] . . . information from any protected computer," *Tech Sys., Inc. v. Pyles*, 630 F. App'x

184, 186 (4th Cir. 2015) (fourth alteration in original) (quoting § 1030(a)(2)(C)), "resulting in a

loss to one or more persons during any one-year period aggregating at least $5,000 in value,"

*Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 923 (E.D. Va. 2017).

The Fourth Circuit has upheld an Eastern District of Virginia judge's definition of

"intentionally" to mean that someone "knowingly performed an act, deliberately and willfully on

purpose as contrasted with accidentally, carelessly, or unintentionally." *United States v. Spirito*,

36 F.4th 191, 210 (4th Cir. 2022).  The Fourth Circuit has "literally and narrowly" construed

"access[ing] a computer without authorization or exceed[ing] authorized access" to refer to

---

[12] Plaintiff's Complaint seeks relief for violations of 18 U.S.C. §§ 1030(a)(2)(C),
1030(a)(4), and 1030(a)(5)(C).  (ECF No. 1 ¶ 121.)  Plaintiff has since alleged a violation of
18 U.S.C. § 1030 (a)(5)(A)—which includes the knowing transmission of information that
results in intentional damage without authorization to a protected computer—within its
Memorandum of Law in Opposition to the Defendants' Motion to Dismiss.  (ECF No. 20, at 15.)
However, "[b]ecause a memorandum in opposition to a motion is not a proper vehicle for
amending a complaint or adding new claims, [this] additional claim[] will not be considered."
*Moise v. Howard Cnty. Det. Ctr.*, No. CV 18-1355, 2019 WL 454101, at *4 (D. Md. Feb. 4,
2019) (citation omitted), *aff'd*, 807 F. App'x 272 (4th Cir. 2020); *see also Sears v. Hibbs*, Case
No. 2:21cv158, 2022 WL 1540208, *4 n.6 (E.D. Va. May 16, 2022) (citing *Moise*, 2019 WL
454101, at *4 for the proposition that "a response in opposition to a motion is not a proper
vehicle for amending a complaint or adding new claims" (internal quotation marks omitted)).

instances where an individual accesses a computer without permission, *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 203 (4th Cir. 2012) (citations omitted).  As relevant here, the Fourth Circuit has interpreted this language numerous times in the employment context.

Within the context of employment, an employee has authorization to access a computer when his or her "employer approves or sanctions his [or her] admission to that computer." *Id.* at 204 (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009)) ("Thus, [an employee] accesses a computer 'without authorization' when he [or she] gains admission to a computer without approval.").  Upon termination of an employment arrangement, the authorization that the individual enjoyed as an employee also terminates even if the employer has not yet altered the credentials to formally revoke access to a computer.  *See United States v. Steele*, 595 F. App'x 208, 211 (4th Cir. 2014).  If the employer owns the account, this cessation of authorization applies even when the terminated employee was the person who first created the credentials necessary for access.  *See Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 924 (finding that a former employee violated the CFAA when they accessed an account they had created but which was wholly owned by their employer).

Moreover, in this context, the meaning of the words "obtain information" includes not only the copying or transporting of information, but also the mere observation, or reading, of it. *See* Economic Espionage Act of 1996, Pub. L. 104–294, Title II, § 201, 110 Stat. 3488, 3491–92 (1996); S.Rep. No. 104–357, at *7, 1996 WL 492169 (1996) (discussing 18 U.S.C. § 1030(a)(2) and stating that "[b]ecause the premise of this subsection is privacy protection, the [Senate Judiciary] Committee wishes to make clear that 'obtaining information' in this context includes mere observation of the data"); *see also Freedom Banc Mortg. Servs. v. O'Harra*, Case No. 2:11-cv-01073, 2012 WL 3862209, at *12 (S.D. Ohio Sept. 5, 2012) (citing Economic Espionage Act

of 1996, Pub. L. 104–294, Title II, § 201, 110 Stat. 3488, 3491–92 (1996); S. Rep. No. 104–357, at *7, 1996 WL 492169 (1996)); and *Philips N. Am. LLC v. Advanced Imaging Servs., Inc.*, Case No. 2:21cv876, 2021 WL 5054395, at *2 (E.D. Cal. Nov. 1, 2021) (citing *United States v. Drew*, 259 F.R.D. 449, 457 (C.D. Cal. 2009), a criminal case, for the proposition that "'obtaining information from a computer' has been described as including mere observation of the data").

Further, under the CFAA, "a '[protected] computer' is a high-speed processing device[,] . . . includ[ing] any data storage facility or communications facility directly related to or operating in conjunction with such device" that "is used in or affecting interstate or foreign commerce." *WEC Carolina Energy Solutions LLC*, 687 F.3d at 204 (quoting § 1030(e)(1)–(2)). This includes servers and, by extension, accounts connected to the internet requiring authorization credentials for access. *See Maplebear Inc. v. Does*, Case No. 1:21cv474, 2022 WL 1837935, at *4 (E.D. Va. Apr. 6, 2022) ("Plaintiff's servers . . . qualify as protected computers."); *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 926–27 (stating that because "the [Google Drive] account [at issue] was connected to—and entirely contained within—the Internet," the plaintiff had "sufficiently pleaded that [the defendant] accessed a 'protected computer' under the CFAA").

### 2.   Good 'Nuff Garage Has Plausibly Alleged That Defendants McCulley and Chester Dog Violated § 1030(a)(2)(C)

Good 'Nuff Garage has alleged sufficient facts to state a claim under § 1030(a)(2)(C) that Defendants accessed a protected computer without authorization and obtained information from a protected computer.  Plaintiff has stated facts alleging that, by accessing and altering Plaintiff's Facebook page (including by deleting it), Defendant McCulley and Defendant Chester Dog (through Defendant McCulley) "intentionally access[ed] a computer without authorization," that they obtained information, that they did so from a "protected computer," and that Plaintiff has

suffered at least $5,000 in a one-year period as a result. *Tech Sys., Inc.*, 630 F. App'x at 186 (fourth alteration in original) (quoting § 1030(a)(2)(C)); *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 922–23.

To begin, reading the Complaint favorably, Plaintiff has properly alleged that Defendants McCulley and Chester Dog "intentionally access[ed] a computer without authorization" through its allegations pertaining to the Facebook page.[13] *Tech Sys., Inc.*, 630 F. App'x at 186 (fourth alteration in original) (quoting § 1030(a)(2)(C)). Indeed, Plaintiff states that after his resignation, and thus after his authorization had been terminated, *see Steele*, 595 F. App'x at 211; *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 924, "Defendant McCulley (i) created a public post on Plaintiff's Facebook page[;] . . . and[,] (ii) changed the contact email on the Facebook page to gngperformance1@gmail.com, which is not Plaintiff's email, and which utilized the GNG mark," (ECF No. 1 ¶ 63). Thus, Defendant McCulley, and through him, Defendant Chester Dog, "intentionally accessed [the Facebook page] without authorization." *Tech Sys., Inc.*, 630 F. App'x at 186 (fourth alteration in original) (quoting § 1030(a)(2)(C)); *see Steele*, 595 F. App'x at 211; *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 924.

In addition, Plaintiff has sufficiently alleged that Defendants McCulley and Chester Dog obtained information through Defendant McCulley's improper access of the Facebook page. *See Tech Sys., Inc.*, 630 F. App'x at 186 (fourth alteration in original) (quoting § 1030(a)(2)(C)). Specifically, Plaintiff states that Defendant McCulley posted on the Facebook page and changed the contact email for the page. (*See* ECF No. 1 ¶¶ 61, 63.) Therefore, Defendant McCulley had

---

[13] To the extent Defendants suggest as mitigation that Defendant McCulley created the Facebook page before his employment by Good 'Nuff Garage, that is of no moment. Plaintiff declares that he "transferr[ed] the 'Good Nuff' Garage' page to Plaintiff's business Facebook page, which included changing the 'Good Nuff' Garage' Facebook page to Plaintiff's business Facebook page under the name 'GNG Motorsports.'" (ECF No. 1 ¶ 46.)

access to (and saw), at a minimum, settings pertaining to Plaintiff's contact information and posts and thus obtained information, satisfying that requirement of an obtaining information claim. *See* Economic Espionage Act of 1996, Pub. L. 104–294, Title II, § 201, 110 Stat. 3488, 3491–92 (1996); S.Rep. No. 104–357, at *7, 1996 WL 492169 (1996) (discussing 18 U.S.C. § 1030(a)(2)); *Freedom Banc*, 2012 WL 3862209, at *12 (citing Economic Espionage Act of 1996, Pub. L. 104–294, Title II, § 201, 110 Stat. 3488, 3491–92 (1996); S.Rep. No. 104–357, at *7, 1996 WL 492169 (1996)); *Philips N. Am. LLC*, 2021 WL 5054395, at *2 (citing *Drew*, 259 F.R.D. at 457.

Further, the Facebook page constitutes a "protected computer" under § 1030(a)(2)(C)). *See Maplebear*, 2022 WL 1837935, at *4; *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 926–27.

Finally, read favorably, Plaintiff's Complaint alleges facts indicating that it has suffered losses during a "one-year period aggregating at least $5,000 in value." *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 922–23. Indeed, Plaintiff alleges that between July 2021, and September 2, 2021 (the date of the Complaint's filing), it lost $97,000 in revenue and $14,500 in profit, as well as its need to return over $22,000 to customers, a number that, at the time of filing, Plaintiff stated continued to increase. (*See* ECF No. 1 ¶¶ 59–60.) Plaintiff also submits that its Facebook page had thousands of likes and followers, a showing of the goodwill toward Plaintiff's business, (*see* ECF No. 1 ¶ 65); *see America Online, Inc. v. LCGM Inc.*, 46 F. Supp. 2d 444, 450 (E.D. Va. 1998) (declaring that loss of reputation and goodwill are damages under the CFAA); *see also Microsoft Corp. v. Ralls*, Case No. C10-0818, 2011 WL 13362361, at *6 (citing *In re Am. Online, Inc. Ver. 5.0 Software Litig.*, 168 F. Supp. 2d 1359, 1380 (S.D. Fla. 2001)) ("Value can include intangible benefits, such as customers and goodwill."), and that,

"[i]nstead of returning the admin rights, Defendant McCulley deleted Plaintiff's business Facebook page, causing further harm to Plaintiff," (*see* ECF No. 1 ¶ 68). These allegations plainly support a finding that Plaintiff has suffered losses of at least $5,000 as a result of Defendant's unauthorized access of a protected computer.

In sum, Good 'Nuff Garage has stated facts sufficient to satisfy § 1030(a)(2)(C)—the obtaining information claim—and the Court will deny the Motion to Dismiss as to Plaintiff's Count II claim pertaining to that subsection.

### 3.   Legal Standard: § 1030(a)(4), the Loss from Unauthorized Access with Intent to Defraud Claim

To maintain a civil claim under § 1030(a)(4) of the Computer Fraud and Abuse Act—an a plaintiff must allege that the defendant:

> knowingly and with intent to defraud[,] . . . accessed a protected computer . . . without authorization[,] or exceed[ed] authorization that was granted[,] and furthered the intended fraud by obtaining anything of value," . . . causing a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

*Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 923.

The CFAA does not define "knowingly" or "with an intent to defraud," but this language "is the bread and butter of many criminal statutes." *United States v. Nosal*, 844 F.3d 1024, 1032 (9th Cir. 2016). For instance, in the criminal context, "knowingly" is often interpreted to mean that a party acted "voluntarily and intentionally and not because of accident, mistake or some other innocent reason." *E.g.*, *United States v. Fall*, Case No. 2:17cr12, 2018 WL 9854664, at *2 (E.D. Va. May 14, 2018) (criminal case). Additionally, courts within the Fourth Circuit, and across the nation, frequently define acting with "intent to defraud" as "to act knowingly and with the specific intent to deceive." *E.g.*, *United States v. Cohen*, Case No. CR. WDQ-14-0310, 2015 WL 2261661, at *15 (D. Md. May 7, 2015) (criminal case); *United States v. Finazzo*, 850 F.3d

94, 108 (2d Cir. 2017) (criminal case) (stating that the district court in that case "instructed the jury that . . . [t]o act with 'intent to defraud' means to act knowingly and with the specific intent to deceive" and declaring that this instruction was "consistent with [its] prior decisions and therefore not erroneous"); *see also* 1A O'Malley, Grenig and Lee, Federal Jury Practice and Instructions § 16.07 (6th ed. 2008) ("To act with *['intent to defraud'] ['fraudulent intent']* means to act knowingly and with the intention or thew purpose to deceive or to cheat.").

Courts within the Fourth Circuit explain the CFAA construction of accessing a computer without authorization or exceeding authorized access "literally and narrowly" to refer to instances where an individual accesses a computer without permission. *See Carolina Energy*, 687 F.3d at 204 (civil).  In addition, to "further[] the intended fraud" has been interpreted in this District to cover actions taken to carry out the fraud. *Cf. Maplebear*, 2022 WL 1837935, at *4 (stating that the "[d]efendants . . . knowingly accessed [the p]laintiff's servers to benefit from [the p]laintiff's algorithm and profitability" and finding that the plaintiff had stated a claim under the Computer Fraud and Abuse Act).

Finally, under the CFAA, something of value need not refer only to physical items, but can also refer to information that would benefit the party attempting to carry out the fraud. *See Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 923 (quoting § 1030(a)(4)); *Maplebear*, 2022 WL 1837935, at *4 (stating that the "[d]efendants . . . knowingly accessed [the p]laintiff's servers to benefit from [the p]laintiff's algorithm and profitability" and that the "[d]efendants therefore knowingly obtained 'something of value' from protected computers through their fraudulent activity and conduct").

### 4.   Good 'Nuff Garage Has Plausibly Alleged That Defendants Violated § 1030(a)(4)

Good 'Nuff Garage has plausibly alleged that Defendants violated § 1030(a)(4)— a loss from unauthorized access with intent to defraud claim—by accessing a protected computer without authorization, thereby causing a loss. Indeed, Plaintiff furthers its positions by facts supporting an inference that Defendant McCulley:

> knowingly and with intent to defraud[,] . . . accessed a protected computer . . . without authorization[,] or exceed[ed] authorization that was granted[,] and furthered the intended fraud by obtaining anything of value," . . . causing a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

*Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d at 923.

Defendants McCulley and Chester Dog's conduct meets the requirement of "knowingly and with an intent to defraud." (ECF No. 1 ¶ 116); *see also United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016) (explaining that this the "knowingly and with intent to defraud" language is intended to exclude innocent conduct). Plaintiff has successfully pled that Defendant McCulley, and through him Defendant Chester Dog, accessed a computer without authorization. Further, Good 'Nuff Garage maintains that these Defendants acted "with an intent to defraud." (ECF No. 1 ¶ 116.) Specifically, Plaintiff states that control of the Facebook page enabled the use of "the 'GNG' and 'GNG Motorsports' marks for Defendants' benefit, with the intent to harm Plaintiff." (ECF No. 1 ¶ 117; *see also* ECF No. 1 ¶ 98 (explaining that Defendants were starting a rival auto-repair business and Plaintiff has alleged that Defendants used the GNG Motorsports Facebook page "with an intent to confuse and deceive the public").) Viewed in the light most favorable to Plaintiff, the allegations in the Complaint amply meet the pleading standard for showing that Defendants acted "knowingly and with an intent to defraud." *Tech Sys., Inc.*, 630 F. App'x at 186 (quoting § 1030(a)(4)); *cf. Yap v. Doe*, Case No. 1:22cv170, 2022

WL 1527527, at *4 (E.D. Va. Mar. 25, 2022) (stating that the defendant that had "intentionally accessed a protected computer" had violated the Computer Fraud and Abuse Act, and citing § 1030(a)(4)).

The Court has decided that Plaintiff has plausibly alleged that Defendant McCulley "intentionally access[ed] a computer without authorization" through its allegations pertaining to the Facebook page. *Tech Sys., Inc.*, 630 F. App'x at 186 (fourth alteration in original) (quoting § 1030(a)(2)(C)); *see See* Part III.B.2. Moreover, as described in the Complaint, Defendant McCulley's conduct in accessing Plaintiff's Facebook page was plainly in furtherance of the intended fraud. *See Maplebear*, 2022 WL 1837935, at *4.

Further, reading the Complaint favorably, Plaintiff plausibly alleges that Defendant McCulley obtained something of value by accessing the Facebook page. Plaintiff's Facebook page had thousands of likes and followers, a showing of the goodwill toward Plaintiff's business. (*See* ECF No. 1 ¶ 65.) By accessing that page and posting on it, Defendant McCulley hijacked Plaintiff's valuable goodwill. (*See* ECF No. 1-5 (showing that the Facebook page had over 1,700 "likes" and over 1,700 "followers" and that Defendant McCulley's "personal post" on the Facebook page received at least 145 "likes," was "commented" on at least 47 times, and was "shared" at least 3 times)). Defendants' prevention of Plaintiff's use of its own Facebook page plainly benefitted Defendants. (*See* ECF No. 1 ¶ 62.)

Lastly, as discussed earlier, Plaintiff's Complaint alleges facts indicating that it has suffered losses during a "one-year period aggregating at least $5,000 in value." *Estes Forwarding Worldwide LLC*, 239 F. Supp. 3d. at 923; *see* Part III.B.2. Therefore, Plaintiff has satisfied this requirement of § 1030(a)(4).

In sum, Good 'Nuff Garage has plausibly alleged a loss from unauthorized access with intent to defraud claim— that Defendants violated § 1030(a)(4)—and the Court will deny the Motion to Dismiss as to Plaintiff's Count II claim pertaining to that subsection.

### 5. Good 'Nuff Garage Has Plausibly Alleged That Defendants Violated § 1030(a)(5)(C), Intentionally, and Without Authorization, Accessing a Protected Computer Causing Damage and Loss

Under § 1030(a)(5)(C) of the Computer Fraud and Abuse Act, Plaintiff alleges an unauthorized access with damage and loss claim—that Defendants "intentionally access[ed] a protected computer without authorization, and as a result of such conduct, caus[ed] damage and loss."[14] *Tech Sys., Inc.*, 630 F. App'x at 186  (quoting § 1030(a)(5)(C)).

At this procedural juncture, Good 'Nuff Garage has plausibly stated an unauthorized access with damage and loss claim under § 1030(a)(5)(C).  Defendants intentionally accessed a protected computer without authorization.  Plaintiff successfully pleads both damage and loss resulting from Defendants' conduct as those terms are defined in § 1030(e).  Specifically, Plaintiff declares that Defendants "deleted Plaintiff's Facebook business page, causing irreparable harm" because the data associated with the page was unrecoverable.  (ECF No. 1 ¶ 120.)  This deletion resulted in damage to Plaintiff because it impaired both the integrity and availability of the data associated with the GNG Motorsports Facebook page.  Moreover, the deletion of the GNG Motorsports Facebook page led to "the loss of customers.  (ECF No. 1 ¶ 120.)  As of the date of filing, the "Plaintiff ha[d] lost $97,000 in revenue and $14,500 in lost

---

[14] Section 1030(e) defines "damage" and "loss."  § 1030(e). Section 1030(e)(8) defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information."  § 1030(e)(8).  Section 1030(e)(11) defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  § 1030(e)(11).

profit," and it had returned over $22,000 to customers.  (ECF No. 1 ¶ 59.)  These losses fall

squarely within the types of consequential damages contemplated as losses by the statute.

Because Plaintiff's Complaint pleads all the requisite elements of this offense,

Defendant's Motion to Dismiss as to Plaintiff's § 1030(a)(4) claim will be denied.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss.  (ECF

No. 17).

An appropriate order shall issue.

Date: 9/26/2022
Richmond, Virginia

M. Hannah Lauck
United States District Judge